**POST-PETITION SENIOR SECURED LOAN AGREEMENT**

Dated as of March 4, 2008

among

SALEM CAPITAL GROUP, INC.

as Borrower

and

LAURALEE K. BELL — 1993 TRUST

as Lender



This Post-Petition Senior Secured Loan Agreement (the "Agreement") is made as of March 4, 2008, among (i) Salem Capital Group, Inc., an Illinois Corporation and debtor-in-possession under Chapter 11 of the Bankruptcy Code (as defined herein) (the "Borrower"), and (ii) the Lauralee K. Bell — 1993 Trust (the "Lender").

### RECITALS:

A.      On October 25, 2007 (the "Petition Date"), the Borrower filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court").  The Borrower's case is currently pending before the Bankruptcy Court under Case No. 07-19825 (the "Chapter 11 Case").

B.      An immediate and ongoing need exists for the Borrower to obtain funds in order to provide for, among other things, the drafting and confirmation of a liquidating plan, preparation of tax returns and accounting information of the Borrower, and to fund the Borrower's participation in the Scott Litigation (as defined herein).  Accordingly, the Borrower has requested that the Lender extend post-petition financing.

C.      The Lender is willing to provide post-petition financing and incur additional obligations pursuant to section 364(c)(2) of the Bankruptcy Code, but only for the purposes and upon the terms and conditions set forth in this Agreement.

D.      The Borrower, the Lender and certain parties affiliated with the Borrower have executed a Summary of Terms and Conditions dated January 2008 which provides for global settlement among the parties thereto (the "Term Sheet").  A true and correct copy of the term sheet is attached to this Agreement as Schedule 1.

E.      It is contemplated by the parties hereto that the Bankruptcy Court will enter a Final Order (as defined herein) which will approve this Agreement and will authorize the Borrower, pursuant to section 364 of the Bankruptcy Code, to incur senior secured indebtedness under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

1.      **DEFINITIONS**

Capitalized terms used in this Agreement shall have the following respective meanings when used herein:

1.1      "Affiliate" shall mean with respect to any Person (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, five percent or more of the stock or partnership interest having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person or any Affiliate of such Person or (c) each of such Person's officers, directors, joint ventures and partners. For the purpose of this definition, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the

- 1 -

direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise.

1.2    "Agreement" shall mean this Post-Petition Senior Secured Loan Agreement including the schedules and exhibits attached hereto.

1.3    "Bankruptcy Code" shall mean Title 11 of the United States Code, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.

1.4    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or any other court having competent jurisdiction over the Chapter 11 Case.

1.5    "Bell Trust Post-Petition Claim" shall have the meaning ascribed in the Term Sheet.

1.6    "Borrower" shall mean, Salem Capital Group, Inc., Chapter 11 debtor and debtor-in-possession.

1.7    "Budget" shall mean the budget attached hereto as Schedule 2 setting forth the expenses and other items that are to be satisfied by the Loans.

1.8    "Budget Month" shall mean a month that is the subject of the Budget.

1.9    "Business Day" shall mean any day on which banks are open for business in the State of Illinois.

1.10    "Chapter 11 Case" shall mean the Borrower's Chapter 11 case brought before the Bankruptcy Court and designated as Case No. 07-19825.

1.11    "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.12    "Closing Date" shall mean a date that is ten (10) Business Days after the entry of the Final Order or such earlier date after entry of the Final Order agreed to by the Borrower and the Lender.

1.13    "Default" shall mean any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

1.14    "Default Interest Rate" shall mean 9.5%.

1.15    "Default Hearing" shall have the meaning set forth in Section 10.5 hereof.

1.16    "Event of Default" shall have the meaning set forth in Section 10.1 hereof.

CHI99 4929325-8.080397.0011

1.17    "Final Order" shall mean the order entered by the Bankruptcy Court pursuant to section 364(d) of the Bankruptcy Code, in a form and substance acceptable to the Lender in its sole discretion, approving this Agreement and authorizing the incurrence by the Borrower of post-petition senior secured indebtedness in accordance with the terms and conditions of this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in a form and substance that is satisfactory to the Lender. The Final Order shall grant the Lender (1) a perfected first priority Lien on, and security interest in, all present and after acquired property of the Borrower pursuant to Bankruptcy Code 364(d) and (2) an allowed administrative expense claim with superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) pursuant to Bankruptcy Code Section 364(c)(1) with respect to the Borrower's Obligations.

1.18    "GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

1.19    "Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business), (b) all obligations evidenced by Note, debentures, bonds, or similar instruments, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all indebtedness referred to in clauses (a) through (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (e) the Obligations and (f) any guaranty of such Person relating to any Indebtedness set forth in clause (a)-(e) above.

1.20    "Interest Rate" shall mean 8%.

1.21    "IRC" shall mean the Internal Revenue Code of 1986 (or any successor legislation thereto), as amended from time to time.

1.22    "IRS" shall mean the Internal Revenue Service, or any successor thereto.

1.23    "Lender" shall mean the Lauralee K. Bell — 1993 Trust, as lender hereunder, or any successor thereto.

1.24    "Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the

- 3 -

foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the law of any jurisdiction).

1.25    "Liquidating Plan" shall mean a Chapter 11 plan of liquidation to be filed in by the Borrower pursuant to the Term Sheet, in accordance with the terms and conditions set forth in the Term Sheet and consistent with the terms and conditions of this Agreement.

1.26    "Loan" shall mean an advance made by the Lender to the Borrower pursuant to this Agreement, and "Loans" shall mean all such advances.

1.27    "Loan Amount" shall mean an amount not to exceed $88,000.00, or such other amount as may be agreed to in writing by the Parties.

1.28    "Maturity Date" shall have the meaning set forth in Section 2.3 hereof.

1.29    "Note" shall have the meaning set forth in Section 2.2(b) hereof.

1.30    "Obligations" means the Loans, the accrued interest thereon, and all other post-Petition Date advances, debts, fees, expenses, liabilities, obligations, covenants and duties owing by the Borrower to the Lender of every type and description, present or future, whether or not evidenced by any note, guaranty or other instrument, directly arising under or relating to this Agreement or under any other Post-Petition Loan Document, whether or not for the payment of money, loan, guaranty, indemnification, or in any other manner, whether direct or indirect (including, without limitation, those acquired by assignment), absolute or contingent, due or to become due, or hereafter arising and however acquired.

1.31    "Other Taxes" shall have the meaning set forth in Section 2.8(b) hereof.

1.32    "Parties" shall mean, collectively, the Lender and the Borrower.

1.33    "Permitted Variance" shall mean expenses and disbursements that do not exceed the amounts set forth in Budget for the relevant Budget Month by more than ten percent (10%) in the aggregate.

1.34    "Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

1.35    "Petition Date" shall mean October 25, 2007.

1.36    "Post-Petition Collateral" shall have the meaning set forth in Section 4.1 hereof.

1.37    "Post-Petition Loan Documents" shall mean this Agreement, the Note, and all other instruments and agreements executed in connection with this Agreement.

1.38    "Scott Co." shall mean Scott Co. of California, Inc. and any successor in interest thereof.

1.39   "Scott Lawsuit" shall mean, generally, all litigation brought by or on behalf of Scott Co. which is subject to the collateral or security interests of the Borrower, including, without limitation, the action entitled *Scott Co. of California v. Venetian Casino Resort, et al.,* Case No. A409223, pending before the District Court of Clark County, Nevada.

1.40   "Taxes" shall have the meaning set forth in Section 2.8(a) hereof.

1.41   "United States Trustee" shall mean the United States Trustee appointed to serve in the Northern District of Illinois pursuant to 28 U.S.C. § 581 *et seq.*

1.42   Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP consistently applied. That certain terms or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. All other undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Bankruptcy Code to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including any schedules and exhibits attached hereto, as the same may from time to time be amended, modified or supplemented and not to any particular section, subsection or clause contained in this Agreement.

1.43   Each reference to a section or exhibit are to a section or exhibit of or to this Agreement, unless otherwise specified or the context otherwise requires.

1.44   Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

## 2.   AMOUNT AND TERMS OF LOAN

2.1   Commitment to Provide Loans. The Lender agrees, on the terms and conditions set forth in this Agreement, to make Loans to the Debtor from time to time prior to the Maturity Date in an aggregate principal amount not exceed to the Loan Amount, provided that (a) no Event of Default has occurred or is continuing and (b) the Loans advanced are used solely for the expenses and items set forth in the Budget attached hereto as Schedule 2.

2.2   Method of Borrowing.

(a)   The Debtor shall request Loans by submitting a written request to the Lender by no later than 11 a.m. prevailing Central Time on the second Business Day of any Budget Month specifying the principal amount of the Loan requested for the next succeeding Budget Month. The Lender shall honor each loan request by making, on the first Business Day of the Budget Month to which such request relates, a wire transfer to the Borrower's operating account in the amount of the Loan requested, provided that (a) honoring the request would not cause the aggregate amount of outstanding Loans to exceed the Loan Amount, (b) no Event of

CHI99 4929325-8.080397 0011

Default has not occurred and is continuing, and (c) the Loans advanced are used solely for the expenses and items set forth in the Budget. Each request for an advance shall constitute a representation by the Debtor that each of the conditions to Loans in Article 3 has been satisfied and that each of the representations and warranties in Article 5 of this Agreement is true and complete in all material respects as of the date of such request.

(b)    Each advance made by the Lender shall constitute a Loan, and shall be evidenced by a promissory note made payable to the Lender, substantially in the form attached hereto as Exhibit A (the "Note"). The Lender or its representatives shall record the date and amount of each Loan in a ledger, which ledger shall constitute *prima facie* evidence of the accuracy of the information therein recorded. The entire unpaid balance of the Loans and all accrued and unpaid interest thereon and any other Obligations shall be due and payable on the Maturity Date.

2.3    Maturity Date.    The Loans shall mature, and the principal amount of all outstanding Loans, together with all accrued and unpaid interest thereon and all other Obligations that may be due to the Lender under this Agreement, shall be immediately due and payable from the assets of the Borrower or the proceeds of the disposition thereof by the Borrower to Lender upon (the "Maturity Date"):

(a)    The earliest of the following (i) June 1, 2009, (ii) the date on which there are sufficient cash proceeds in the Liquidating Trust to satisfy the Bell Trust Post-Petition Secured Claim (as such terms are defined in the Term Sheet), or (iii) the date of acceleration of the Obligations upon the occurrence of an Event of Default; or

(b)    Such other date as agreed to in writing by the Lender and Borrower or its successor in interest.

Notwithstanding the occurrence of the Maturity Date or any other provision of this Agreement, the Lender shall advance funds to the Borrower to satisfy the outstanding fees of the Borrower's professionals through and including such Maturity Date, pursuant to and in accordance with the Budget not to exceed $75,000.00, when such fees are allowed to be paid by a Final Order of the Bankruptcy Court, regardless of (1) the timing of the entry of such Final Order or (2) the status of the Loan at that time.

2.4    Repayment and Prepayment.

(a)    The entire unpaid principal amount of the Loan, together with all accrued and unpaid interest thereon and all other Obligations that may be due to the Lender under this Agreement, shall be due and payable on the Maturity Date.

(b)    The Borrower may prepay the Loan or any portion thereof at any time which prepayment shall be applied, first, to accrued and unpaid interest on such Loan and capitalized interest, fees and expenses, if any, on the Obligations and, second, to principal in respect of the Loan.

2.5    <u>Use of Proceeds</u>.  The proceeds of the Loans shall be used only to pay the expenses and items set forth in the Budget, in accordance with the Budget, subject to the Permitted Variance.

2.6    <u>Interest on Loan</u>.  Interest on the Loans shall accrue at a rate per annum equal to the Interest Rate, <u>provided</u>, <u>however</u>, that upon the occurrence and continuation of an Event of Default, interest on the Loans shall accrue at a rate per annum equal to the Default Interest Rate.

2.7    <u>Access</u>.  The Lender and its respective agents or representatives shall have the right during normal business hours (or at such other times as may reasonably be requested by the Lender) to inspect, audit and make extracts from all of the Borrower's records, files and books of account. The Borrower shall instruct its banking and other financial institutions, accountants and other advisors and agents to make available to the Lender such information and records as the Lender may reasonably request.

2.8    <u>Taxes</u>.

(a)    Any and all payments by the Borrower hereunder or under the Note shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges, or withholdings attributable thereto and all liabilities with respect thereto (all such levies, imposts, deductions, charges, withholdings and liabilities, excluding taxes imposed on or measured by the net income of the Lender by the jurisdictions under the laws of which the Lender are organized, qualified, or otherwise doing business or any political subdivision thereof, being hereinafter referred to as "<u>Taxes</u>").  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Note to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions the Lender receive an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, and (iii) the Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law.

(b)    The Borrower agrees to pay any present or future stamp or documentary taxes or any other sales, excise or property taxes, charges or similar levies that arise from any payment made hereunder or under any note or from the execution or delivery of, or otherwise with respect to, this Agreement or the Note (hereinafter referred to as "<u>Other Taxes</u>").

(c)    The Borrower shall indemnify the Lender for the full amount of Taxes and Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.8) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor.

(d)    Within thirty (30) days after the date of any payment of Taxes, the Borrower shall furnish to the Lender, at the addresses for the Lender referred to in Section 10.14, the original or a certified copy of a receipt evidencing payment thereof.

- 7 -

(e)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.8 shall survive the Maturity Date and the payment in full of principal and interest hereunder and under the Note.

## 3.   CONDITIONS PRECEDENT FOR FUNDING OF LOANS

The Lender's obligation to make a Loan to the Borrower is subject to the satisfaction of each of the following conditions precedent on any relevant borrowing date:

3.1     The Lender shall have received a fully executed copy of this Agreement, the Note and any other Post-Petition Loan Documents;

3.2     The Final Order shall have been entered by the Bankruptcy Court and shall not have been vacated, revised, modified or amended;

3.3     All of the Borrower's representations and warranties contained in this Agreement and the other Post-Petition Loan Document, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan with the same effect as if made on and as of such date; and

3.4     No default or Event of Default shall have occurred and be continuing.

## 4.   SECURITY

4.1     The Borrower's Obligations shall be secured by a valid, perfected and first-priority Lien on all assets and properties of the Borrower now owned or hereafter acquired, including, without limitation, the following (the "Post-Petition Collateral"):

(a)     All of the Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of the Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due the Borrower in connection and all of the Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

(b)     All moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by, in transit to, in possession of, or under the control of the Lender or a bailee or an Affiliate of the Lender, from or for Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of the Borrower's deposits (general or special), balances, sums and credits with the Lender at any time existing;

(c)     All of the Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to their accounts, accounts receivable, and other rights to payment, including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger

- 8 -

cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

(d)    All of the Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, chose-in-action, claims, information contained in computer media (such as data bases, source and object codes, and information therein), things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Borrower thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

(e)    All of the Borrower's now owned and hereafter acquired inventory of every kind and character which is held by the Borrower for sale or lease, or is furnished by the Borrower under any contract of service, or is held by the Borrower as raw materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(f)    All of the Borrower's now owned or hereafter acquired real property, machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(g)    All of the Borrower's rights, claims, accounts, and causes of action against any Person including, without limitation, (1) Scott Co. and its affiliates, (2) Salem Capital Partners, Inc., (3) Salem Capital Securities, Inc., (4) Salem Capital Services, Inc., (4) the estate of Craig F. Glattly, (5) the Craig F. Glattly Trust, (6) the Craig F. Glattly Family Trust, (7) William Dugan, (8) Arden Lane, LLC, and (9) Integrated Parking Solutions, Inc.; and

(h)    All of the Borrower's rights, claims, and interests in and to (1) that certain Loan and Security Agreement dated as of March 31, 2003 by and between the Borrower and Scott Co., (2) that certain Secured $10,000,000 Promissory Note made by Scott Co., (3) that certain Funding Agreement dated as of March 10, 2004 by and between the Borrower and Scott Co., (4) that certain Assignment of Loan Documents dated as of October 1, 2004 by and between the Borrower and Wells Fargo Bank, N.A., (5) that certain Supplemental Funding Agreement dated as of February 22, 2005 by and between the Borrower and Scott Co., (6) that certain Scott Affirmative Claims Prosecution Agreement dated as of September 14, 2005 by and among the Borrower, Scott Co. and certain of its affiliates, and St. Paul Fire and Marine Insurance Company and certain of its affiliates, (7) the Scott Lawsuit and any proceeds thereof, and (8) those certain judgments the Borrower obtained against Scott Co., The Scott Companies, Inc., Robert Nurisso, and Joseph Guglielmo (collectively, the "Scott Collateral"); and

(i)  The income, profits, and proceeds of all of the foregoing.

4.2  The Lender will be entitled to the protections and priorities provided under Section 507(b) of the Bankruptcy Code. No other claim having a priority superior to that granted to the Lender by the Final Order shall be granted while any portion of the Obligations remain outstanding.

4.3  Upon entry of the Final Order, the Liens and security interests granted to the Lender on the Post-Petition Collateral by virtue of the Final Order and this Agreement shall be first, valid and perfected without regard to applicable federal, state or local filing or recording statutes; provided, however, that the Lender may, but need not, take such steps as it deems desirable and applicable to comply with such statutes.

## 5.  REPRESENTATIONS AND WARRANTIES

The Borrower Subsidiaries hereby represents and warrants to the Lender that:

5.1  Organization; Powers.  The Borrower (a) is a corporation duly incorporated, formed or organized, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization, as the case may be, (b) has all requisite corporate, partnership or similar power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, and (c) has the corporate power and authority to execute, deliver and perform its obligations under this Agreement and each of the Post-Petition Loan Documents.

5.2  Authorization.  The execution, delivery and performance by the Borrower under this Agreement and each of the Post-Petition Loan Documents (a) have been duly authorized by all requisite corporate and, if required, stockholder action and (b) will not (i) violate (A) any provision of law, statute, rule or regulation applicable to the Borrower, (B) the certificate or articles of incorporation or other constitutive documents or by-laws of the Borrower, (C) any order of any governmental authority applicable to the Borrower, or (D) any provision of any indenture, agreement or other instrument to which the Borrower is a party or by which any of them or any of their property is or may be bound.

5.3  Enforceability.  This Agreement and each of the Post-Petition Loan Documents has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, subject to the Bankruptcy Code.

5.4  Disclosures.  The Disclosures (as defined in the Term Sheet) heretofore furnished to the Lender are true, correct, and complete in all material respects.

5.5  No Material Adverse Change.  There has been no material adverse change in the assets, prospects, financial condition, or otherwise, taken as a whole, since the Petition Date.

5.6  Use of Proceeds.  The Borrower shall use the proceeds of the Loans only to pay the expenses and items set forth in the Budget, in accordance with the Budget.

6.    **REPORTING REQUIREMENTS**

The Borrower covenants and agrees that from and after the Closing Date and until the Maturity Date, it shall deliver the following to the Lender:

6.1    As soon as practicable, but in any event within five (5) Business Days after the Borrower becomes aware of the existence of any Default or Event of Default, telephonic or facsimile notice specifying the nature of such Default or Event of Default or development or information, including the anticipated effect thereof;

6.2    Copies of all federal, state, and local tax returns and reports filed by the Borrower;

6.3    Copies of all notices given, motions and documents filed, and orders entered in the Chapter 11 Case; and

6.4    Such other information regarding the Borrower's businesses, financial condition, or prospects as the Lender may, from time to time, reasonably request.

7.    **AFFIRMATIVE COVENANTS**

The following covenants shall be binding on the Borrower from and after the date hereof and until the repayment in full of the Obligations:

7.1    Maintenance of Existence and Conduct of Business.  The Borrower covenants and agrees to (a) do all things necessary to preserve and keep in full force and effect its corporate existence, as applicable, and (b) continue to conduct its business substantially as now conducted, as provided for in this Agreement and the Term Sheet or as otherwise agreed to in writing by the Lender.

7.2    Implementation of Term Sheet.  The Borrower covenants and agrees to undertake its reasonable best efforts to promptly implement and consummate the Term Sheet and the transactions contemplated by the Term Sheet.

7.3    Books and Records.  The Borrower covenants and agrees to keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of their financial transactions, are made in accordance with GAAP.

7.4    Compliance with Law.  The Borrower covenants and agrees to comply with all federal, state and local laws and regulations applicable to it, including environmental laws, except where such noncompliance is not reasonably expected to have a material adverse effect on the Borrower, its businesses or its financial positions.

7.5    Supplemental Disclosure.  From time to time as may be necessary (in the event that such information is not otherwise delivered by the Borrower to the Lender pursuant to this Agreement), so long as there are Obligations outstanding, the Borrower covenants and agrees to supplement or amend each representation herein with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set

- 11 -

forth or described in an exception to such representation or which is necessary to correct any information in such representation which has been rendered inaccurate thereby.

7.6    <u>Filing of Financing Statement with Respect to Scott Collateral</u>. From time to time as may be necessary, so long as there are Obligations outstanding, the Borrower covenants and agrees to execute such financing statements and other documents and to do such other acts as the Lender may require to perfect and preserve the Borrower's security interest in, and to enforce such interests in the Scott Collateral.

## 8.    NEGATIVE COVENANTS

The following covenants shall be binding on the Borrower from and after the date hereof and until the repayment in full of the Obligations:

8.1    <u>Implementation of Term Sheet</u>.    The Borrower shall not take any action inconsistent with the Term Sheet or the prompt implementation of the transactions contemplated thereby.

8.2    <u>Mergers, and Other Material Transactions</u>.    The Borrower shall not directly or indirectly, by operation of law or otherwise, merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with, any Person, unless otherwise agreed to in writing by the Lender.

8.3    <u>Maintenance of Business</u>.    The Borrower shall not engage in any business other than the businesses currently engaged in by the Borrower unless otherwise agreed to in writing by the Lender.

8.4    <u>Sales of Assets</u>.    The Borrower shall not sell, lease, transfer, convey or otherwise dispose of any of its assets (other than obsolete equipment) or properties or attempt or contract to do so, except in the ordinary course of business unless agreed to in writing by the Lender.

8.5    <u>Events of Default</u>.    The Borrower shall not take or omit to take any action, which act or omission would constitute a Default or an Event of Default.

8.6    <u>Indebtedness</u>.    The Borrower shall not create, nor shall they permit to exist any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (a) Indebtedness to the Lender arising under or as a consequence of this Agreement or the Post-Petition Loan Documents, (b) other Indebtedness existing on the Petition Date, (c) unsecured trade payables incurred in the ordinary course, and (d) deferred Taxes.

8.7    <u>Liens</u>.    The Borrower shall not create or permit any Liens on any of its properties or assets except the Liens existing as of the Petition Date and the Liens created under this Agreement and the Post-Petition Loan Documents.

8.8    <u>Lease Obligations</u>.    The Borrower shall not create, incur, or suffer to exist any obligations as lessee (a) for the payment of rent for any real or personal property in connection

- 12 -

with any sale and leaseback transaction entered into after the Petition Date, or (b) for the payment of rent for any real or personal property under leases entered into after the Petition Date.

9.    **TERM**

9.1    Termination.  Subject to the provisions of Section 9 hereof, the Loans provided for under this Agreement shall be in effect from the Closing Date until the Maturity Date.

9.2    Survival of Obligations upon Termination of Financing Arrangement.    No termination or cancellation of any financing arrangement under this Agreement (regardless of the cause or procedure) shall in any way affect or impair the duties and obligations of the Borrower or the rights and powers of the Lender relating to any transaction or event occurring prior to such termination and all claims granted to the Lender hereunder shall continue in full force and effect until all Obligations are paid in full.  All undertakings, agreements, covenants, warranties, and representations contained in the Post-Petition Loan Documents shall survive such termination or cancellation and shall continue in full force and effect until such time as all of the Obligations have been paid in full in accordance with the terms of the agreements creating such Obligations.

10.    **EVENTS OF DEFAULT; RIGHTS AND REMEDIES**

10.1    Events of Default.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    The Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation when due;

(b)    The Borrower breaches, defaults, or fails or neglects to perform, keep or observe any covenant or provision of this Agreement, the Note, or any other Post-Petition Loan Document, and the same shall remain unremedied or unwaived for a period ending on the first to occur of (i) three (3) Business Days after the Borrower receives written notice from the Lender or (ii) ten (10) days after the Borrower first becomes aware thereof;

(c)    The Borrower's expenses for any particular Budget Month exceeds the amount set forth in the Budget by more than the Permitted Variance for the relevant week;

(d)    Any party to the Term Sheet (other than the Lender) breaches, defaults, or fails or neglects to perform, keep or observe any covenant or provision thereof;

(e)    Any representation, warranty, certification or statement made by the Borrower in this Agreement, any Post-Petition Loan Document, or any document to which the Borrower and the Lender are parties or by the Borrower in any certificate, financial statement or other document delivered pursuant hereto or thereto proves to have been incorrect in any material respect when made;

(f)    This Agreement shall cease to be effective to grant a perfected security interest in the Post-Petition Collateral with the priority stated to be created thereby or such

- 13 -

security interest shall cease to be in full force and effect or shall be declared null or void, or the validity or enforceability of such security interest or this Agreement shall be contested by the Borrower;

(g)    Any party to the Term Sheet files an objection to the Lender's proof claim for pre-Petition Date amounts owed;

(h)    The Borrower or any party to the Term Sheet, by motion, adversary action or other means challenges or disputes in any manner, the nature, extent or validity of the Borrower's Lien on the Post-Petition Collateral;

(i)    If the Borrower breaches or violates any term of the Final Order;

(j)    Dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(k)    Appointment of a Chapter 11 trustee in the Chapter 11 Case;

(l)    The Borrower fails to file the Liquidating Plan (as defined in the Term Sheet) and accompanying disclosure statement on or before March 31, 2008;

(m)    The Borrower files a Chapter 11 plan that is inconsistent with, or does not contain all of the terms and conditions for the Liquidating Plan set forth in the Term Sheet, including, without limitation, the terms and conditions set forth in Sections 5(a) through (h) of the Term Sheet;

(n)    The Bankruptcy Court does not enter an order confirming the Liquidating Plan on or before May 22, 2008.

10.2    <u>Contractual Remedies</u>.    Upon the occurrence and during the continuation of an Event of Default, the Lender may, without notice, (a) terminate this Agreement, whereupon all outstanding Obligations will be immediately due and payable, and (b) exercise any and all rights and remedies provided under this Agreement and the Post-Petition Loan Documents.

10.3    <u>Legal Remedies</u>.    Upon the occurrence and during the continuation of an Event of Default, the Lender may, without notice, exercise all rights and remedies provided under the Uniform Commercial Code in effect in any applicable jurisdiction and under any other applicable law.    The rights and remedies provided for under this Section 10.3 include, without limitation, the following:

(a)    The right to take possession of, send notices regarding, and collect directly the Post-Petition Collateral, with or without judicial process, and to exercise all rights and remedies available to the Lender with respect to the Post-Petition Collateral under the Uniform Commercial Code in effect in any jurisdiction in which such Post-Petition Collateral is located; and

(b)    The right to (by its own means or with judicial assistance) take possession of the Post-Petition Collateral, or render it unusable, or dispose of the Post-Petition Collateral on

- 14 -

such premises without any liability for rent, storage, utilities, or other sums. The Borrower hereby covenants and agrees that they will not resist or interfere with such actions.

10.4   Payments on Collateral. Without limiting the rights of the Lender under any other provision of law or this Agreement, immediately upon and following the occurrence of an Event of Default, all payments received by the Borrower under or in connection with any of the Post-Petition Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly indorsed by the Borrower to the Lender, if required to permit collection thereof by the Lender).

10.5   Relief From Stay.

(a)   Immediately and automatically upon the entry of the Final Order, the Lender shall have irrevocable and presently effective stay relief. Pursuant to such stay relief, all stays and injunctions in the Chapter 11 Case, including, but not limited to, the automatic stay arising on the Petition Date under Section 362(a) of the Bankruptcy Code, will be terminated automatically and irrevocably as to the Lender and with respect to the enforcement of its remedies against the Post-Petition Collateral under this Agreement and the Post-Petition Loan Documents upon the occurrence and during the continuation of a Default or Event of Default.

(b)   Without limiting the foregoing, the Borrower will have the limited right to challenge the occurrence of a Default or Event of Default by requesting a hearing before the Bankruptcy Court upon five (5) business days written notice to the Lender (the "Default Hearing"). Upon receiving notice of the Default Hearing, and pending the Bankruptcy Court's decision as to whether a Default or Event of Default has occurred (but in no event for more than five (5) business days after the beginning of the Default Hearing), the Lender will refrain from exercising its remedies with respect to the Post-Petition Collateral and will abide by the terms of any subsequent decision of the Bankruptcy Court. Upon the later of (1) the expiration of the five (5) business day period referenced above or (2) the conclusion of the Default Hearing, if any, and unless the Bankruptcy Court finds that no Default or Event of Default has occurred or is continuing, the Lender shall be irrevocably appointed, with full power of substitution, as the Borrower's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Borrower and in the name of such Borrower or in the Lender's own name, to take any and all appropriate actions and to execute any and all documents, instruments, and court filings which may be necessary or desirable to liquidate or collect the Post-Petition Collateral or otherwise accomplish the purposes of this Agreement.

## 11.   MISCELLANEOUS

11.1   Indemnity. The Borrower shall indemnify and hold the Lender harmless from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements, including those incurred upon any appeal) which may be instituted or asserted against or incurred by the Lender as the result of its having entered into this Agreement or any of the Post-Petition Loan Documents or having extended credit hereunder, excluding any such suits, actions, proceedings,

- 15 -

claims, damages, losses, liabilities, or expenses arising from the gross negligence and/or willful misconduct of the Lender.

11.2   Complete Agreement. This Agreement, the Post-Petition Loan Documents, and the Term Sheet shall constitute the complete agreement between the parties with respect to the subject matter hereof and may not be modified, altered or amended except by an agreement in writing signed by the Borrower and the Lender, with any material modification, alteration, or amendment approved by the Bankruptcy Court after notice and a hearing.

11.3   Sale of Interests. The Borrower may not sell, assign, or transfer this Agreement or any of the Post-Petition Loan Documents or any portion thereof, including, without limitation, the Borrower's duties and obligations thereunder. Notwithstanding the foregoing, the Borrower may assign or transfer the Post-Petition Loan Documents and its duties and obligations thereunder to the Liquidating Trust (as defined in the Term Sheet) pursuant a confirmed Liquidating Plan.   The Borrower hereby consents to the Lender's sale of participation, assignment, transfer or other dispositions, at any time or times, of any of the Post-Petition Loan Documents or of any portion thereof or interest therein, including, without limitation, the Lender's rights, title, interest, remedies, powers, or duties thereunder, whether evidenced by a writing or not.

11.4   Modification of Agreement. No amendment or waiver of any provision of this Agreement, the Note, or any other Post-Petition Loan Document, nor consent to any departure by the Lender therefrom, shall in any event be effective unless the same shall be in writing and signed by each of the Lender and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

11.5   No Waiver by the Lender. The failure of the Lender at any time to require strict performance by the Borrower of any provision of this Agreement, the Note, or any other Post-Petition Loan Document shall not waive, affect, or diminish any right of the Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Lender of a default or Event of Default by the Borrower under this Agreement, the Note, or any other Post-Petition Loan Documents shall not suspend, waive, or affect any other default or Event of Default by the Borrower under this Agreement, the Note, or any other Post-Petition Loan Document whether the same are prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants, and representations of the Borrower contained in this Agreement shall be deemed to have been suspended or waived by the Lender, unless such suspension or waiver is by an instrument in writing signed by the Lender and directed to the Borrower specifying such suspension or waiver.

11.6   Additional Remedies. The Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the Lender may have under any other agreement, including, without limitation, any Post-Petition Loan Document, the Bankruptcy Code, by operation of law or otherwise. This Agreement is without prejudice to any rights of the Lender under the Bankruptcy Code or under applicable non-bankruptcy law.

11.7   Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision

- 16 -

of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

11.8    Parties.  This Agreement, the Note, and the Post-Petition Loan Documents shall be binding upon the Borrower and its respective successors, and shall inure to the benefit of the Lender and its assigns, transferees and endorsees.

11.9    Conflict of Terms.  Except as otherwise provided in this Agreement or the Note by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the Note, the provision contained in this Agreement shall govern and control.

11.10    Governing Law; Litigation.  Except as otherwise expressly provided in any of the Post-Petition Loan Documents, in all respects, including all matters of construction, validity and performance, this Agreement and the Obligations arising hereunder shall be governed by, and be construed and enforced in accordance with, the laws of the State of Illinois applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America.

11.11    Waiver of Jury Trial.  The Borrower hereby waives trial by jury in any action or proceeding of any kind or nature in any court in which an action may be commenced arising out of this Agreement or any assignment thereof or by reason of any other cause or dispute whatsoever between them of any kind or nature.

11.12    Confession of Judgment.  If the Chapter 11 Case is dismissed or if an Event of Default exists with respect to this Agreement that is not cured or waived, the Borrower hereby authorizes any attorney admitted to practice before any court of record in the United States to appear on behalf of the Borrower and to confess judgment against the Borrower in favor of the Lender in the full amount of the Obligations owing in connection with this Agreement and the Note (including principal, accrued interest and reasonable attorneys' fees and court costs and any and all charges, fees and costs).  The Borrower agrees and consents that venue and jurisdiction will be proper in the circuit court of any county of the State of Illinois.  The Borrower waives the benefit of any and every statute, ordinance, or rule of court which may be lawfully waived conferring upon the Borrower any right or privilege of exemption, homestead rights, stay of execution, or supplementary proceedings, or other relief from the enforcement or immediate enforcement of a judgment or related proceedings on a judgment.  The authority and power to appear for and enter judgment against the Borrower will not be exhausted by one or more exercises thereof, or by any imperfect exercise thereof, and will not be extinguished by any judgment entered pursuant thereto; such authority and power may be exercised on one or more occasions from time to time, in the same or different jurisdictions, as often as the Lender will deem necessary, convenient, or proper.

11.13    Notices.  Except as otherwise provided herein, whenever it is provided in this Agreement that any notice, demand, request, consent, approval, declaration, or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another any communication with

-17-

respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be delivered in person by electronic transmission, or facsimile addressed as follows:

(a)  If to the Borrower, at the following addresses:

Brian L. Shaw (bshaw100@shawgussis.com)
Shaw Gussis Fishman Glantz Wolfson & Towbin LLC
321 North Clark Street
Suite 800
Chicago, Illinois 60610
Facsimile Number: (312) 980-3888

(b)  If to the Lender, at the following addresses:

Nathan F. Coco (ncoco@mwe.com)
Joel G. Chefitz (jchefitz@mwe.com)
McDermott Will & Emery LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606-5096
Facsimile Number: (312) 984-7700

11.14  Reversal of Payments.  To the extent that the Borrower makes a payment or payments to the Lender that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver, or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and shall continue in full force and effect, as if such payment or proceeds had not been received by the Lender.

11.15  Survival.  The representations and warranties of the Borrower in this Agreement shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto.

11.16  Section Titles.  The section titles and table of contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever.

11.17  Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.

CHI99 4929325-8.080397.0011

IN WITNESS WHEREOF, this Agreement have been duly executed as of the date first written above.

SALEM CAPITAL GROUP, INC., debtor and debtor-in-possession

By: _____

Name: _____

Title: _____

LAURALEE K. BELL – 1993 TRUST

By: _____

Name: _LAURALEE K. BELL_____

Title: _____

CHI99 4929925-8.080397.0011

IN WITNESS WHEREOF, this Agreement have been duly executed as of the date first written above.

SALEM CAPITAL GROUP, INC., debtor and debtor-in-possession

By: _____

Name: _GRANT W. GLATTLY_

Title: _PRESIDENT_

LAURALEE K. BELL – 1993 TRUST

By: _____

Name: _____

Title: _____

CHI99 4929325-8.080397.0011

# EXHIBIT A

## NOTE

**PROMISSORY NOTE**

$[___]                                                                    Chicago, Illinois
                                                                         March [___], 2008

FOR VALUE RECEIVED, the undersigned SALEM CAPITAL GROUP, INC., an Illinois
Corporation and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Borrower")
promises to pay to the order of the LAURALEE K. BELL — 1993 TRUST ("Lender"), the
principal sum of [___] and [___]/100 Dollars $[___]), or such lesser principal amount as may be
then outstanding, on the dates and in the amounts set forth in the Loan Agreement (as defined
below), together with interest on the unpaid principal amount hereof, at the rates and on the dates
set forth in that certain Post-Petition Senior Secured Loan Agreement, dated of even date
herewith, between Borrower and Lender (herein, as the same may be amended, modified,
restated or supplemented from time to time, called the "Loan Agreement"). All capitalized terms
not defined herein shall have the meanings ascribed to them in the Loan Agreement. If not
sooner paid, Borrower shall pay the principal of and accrued and unpaid interest on the Loan in
full on the Maturity Date.

Payments of both principal and interest are to be made in the lawful money of the United States
of America in immediately available funds at Lender's principal office at [___], or at such other
place as may be designated by Lender to Borrower in writing.

This Promissory Note (the "Note") evidences indebtedness incurred under and is subject to the
terms and provisions of Loan Agreement, including those under which this Note may or must be
paid prior to its due date or may have its due date accelerated; provided, that this Note may be
prepaid in whole or in part without premium or penalty. This Note is secured by the property
described in and pursuant to the Loan Agreement and other documents referred to therein, and
reference is made thereto for a statement of terms and provisions of such collateral security, a
description of collateral and the rights of Lender in respect thereof.

All parties hereto, whether as makers, endorsers or otherwise, severally waive presentment,
demand, protest and notice of dishonor in connection with this Note.

Borrower waives the benefit of any law that would otherwise restrict or limit Lender in the
exercise of its right, which is hereby acknowledged, to set-off against the Obligations, without
notice and at any time hereafter, any indebtedness matured or unmatured owing from Lender to
Borrower.

This Note is binding upon Borrower and its successors and assigns, and shall inure to the benefit
of Lender and its successors and assigns. This Note is made under and governed by the laws of
the State of Illinois without regard to conflict of laws principles.

The ownership of an interest in this Note shall be registered on a record of ownership maintained
by Borrower or its agent. Notwithstanding anything else in this Note to the contrary, the right to
the principal of, and stated interest on, this Note may be transferred only if the transfer is
registered on such record of ownership and the transferee is identified as the owner of an interest
in the obligation. Borrower shall be entitled to treat the registered holder of this Note (as

## SCHEDULE 1
## TERM SHEET

*EXECUTION COPY*

## SUMMARY OF TERMS AND CONDITIONS

*This Summary of Terms and Conditions (the "Term Sheet") sets forth the principal terms of a settlement and compromise by and among (i) the Lauralee K. Bell – 1993 Trust (the "Bell Trust"), (ii) Salem Capital Group, Inc. (the "Debtor"),[1] (iii) Salem Capital Partners, Inc. ("Salem Partners"), (iv) Salem Capital Securities, Inc. ("Salem Securities"), (v) Salem Capital Services, Inc. ("Salem Services"), (vi) the estate of Craig F. Glattly (the "Glattly Estate"); (vii) Lori Glattly, (viii) Grant Glattly, (ix) Paige Glattly, and (x) the Craig F. Glattly Trust and the Craig F. Glattly Family Trust (together, the "Glattly Family Trust"). This Term Sheet is not meant to be, nor should it be construed as, an attempt to define all of the terms and conditions of the transactions contemplated hereby. It does not include descriptions of all the terms, conditions, and other structural elements that may be necessary or will be provided for in the definitive documentation relating to the transactions described herein. Except as set forth* <u>Section 6.(e)</u> *hereof, no legally binding obligations will be created until (i) definitive agreements are executed and delivered by all parties and (ii) the Bankruptcy Court approves the settlement and compromise set forth in those definitive documents pursuant to Federal Rule of Bankruptcy Procedure 9019, an order confirming a plan of liquidation, or some similar final, binding order of the Bankruptcy Court. This Term Sheet does not represent a commitment by the Bell Trust to extend credit. This Term Sheet shall be governed in all respects by the laws of the State of Illinois.*

1.    <u>UCC Disposition</u>.  The Bell Trust shall agree to undo and reverse its pre-petition Uniform Commercial Code disposition of the Debtor's assets.  Title to those assets shall be deemed transferred back to the Debtor, <u>provided</u>, <u>however</u>, that the Bell Trust shall be entitled to retain copies of all documents, in both written and electronic form, in its possession.

2.    <u>Bell Trust Claims</u>.  Except as expressly provided herein, the Bell Trust shall agree to waive and release its security interests in the Debtor's assets.  The Bell Trust shall be granted an allowed, pre-petition, general unsecured claim against the Debtor in the amount of the aggregate outstanding balance owed to the Bell Trust, which according to the Debtor's records was not less than $30,500,000 in 2006, plus accrued and unpaid pre-petition interest and expenses, such amount to be determined and fixed after an accounting in form and substance acceptable to the parties hereto (the *"Bell Trust Pre-Petition Claim"*).

3.    <u>Glattly and Related Party Claims</u>.

(a)    Lori Glattly shall agree to waive and release her security interests in the Debtor's assets.  Lori Glattly shall be granted an allowed, pre-petition, general unsecured claim against the Debtor in the amount of the aggregate outstanding balance owed to Lori Glattly, such amount to be determined and fixed after an accounting in form and substance acceptable to the parties hereto but which, according to the Debtor's records was not less than $340,000 plus accrued and unpaid pre-petition interest and expenses (the *"Lori Glattly Pre-Petition Claim"*).

---

[1]    The Debtor is a chapter 11 debtor-in-possession in Case No. 07-19825, pending before the United States Bankruptcy Court for the Northern District of Illinois (the *"Bankruptcy Court"*).

    (b)    The Glattly Estate shall be granted an allowed, pre-petition, general unsecured claim against the Debtor in the amount of the aggregate *bona fide* third party claims which have been reduced to final judgment or are otherwise reasonably allowed against the Glattly Estate (the *"Glattly Estate Claim"*). To the extent a dispute arises as to whether a claim against the Glattly Estate was reasonably allowed for the purposes of determining the Glattly Estate Claim pursuant to this Section 3.(b), such dispute may be resolved in the Bankruptcy Court. The Glattly Estate Claim shall not include: (i) the claims of relatives or family members of the late Craig Glattly, or (ii) the Debtor or affiliates of the Debtor.

    (c)    Except as otherwise set forth above or elsewhere in this Term Sheet, (i) each of Lori Glattly, Grant Glattly, Paige Glattly, the Glattly Estate, the Glattly Family Trust, Salem Securities, Salem Services, and Salem Partners shall waive, release and discharge their respective rights, claims, causes of action and security interests, if any, against the Debtor and its assets; and (ii) the Debtor (for itself and the Liquidating Trust (described below)) shall waive, release and discharge all of its rights, claims and causes of action, if any, against any and all of the Bell Trust, Lori Glattly, Grant Glattly, Paige Glattly, the Glattly Estate, the Glattly Family Trust, Salem Securities, Salem Services, and Salem Partners, and their respective assets; provided however that: (1) Salem Services shall be permitted to file and assert a pre-petition, general unsecured claim (in an amount not to exceed $830,200) against the Debtor for monies allegedly loaned by Salem Services to the Debtor (the "Salem Services Claim"); (2) all parties hereto shall be deemed to have retained their rights to object to the allowance of the Salem Services Claim; (3) to the extent the Salem Services Claim becomes an allowed claim against the Debtor, the Debtor shall be deemed to have retained its defensive rights and claims (if any) against Salem Services to the extent of the amount of the allowed Salem Services Claim; and (4) all proceeds (if any) of an allowed Salem Services Claim shall be used satisfy only those *bona fide* third party claims of Salem Services' creditors which (x) are not of relatives or family members of the late Craig Glattly, and (y) could not or did not otherwise assert a direct claim against the Debtor, and (z) have been reduced to final judgment or are otherwise reasonably allowed against Salem Services.

    4.    <u>Debtor-in-Possession Financing</u>. The Bell Trust shall, subject to Bankruptcy Court approval, agree to advance funds to the Debtor on a senior secured, administrative priority basis (the *"DIP Loan"*):

    (a)    in an amount of approximately $60,000, which DIP Loan shall be used to fund the administrative expenses of (a) drafting and confirming the Liquidating Plan (described below), (b) preparing tax returns and accounting information for the Debtor, and (c) any other reasonable and necessary administrative expenses agreed to by the Bell Trust; and

    (b)    an amount to be determined to by the Bell Trust in its sole discretion to fund the Debtor's participation in the litigation entitled *Scott Co. of California v. Venetian*

*Casino Resort, et al.*, Case No. A409223, pending before the District Court of Clark County, Nevada (the "*Scott Lawsuit*").

The DIP Loan shall be made pursuant to a credit agreement and budget, each in a form and substance acceptable to the Bell Trust in its sole discretion. The DIP Loan shall be secured by all of the assets of the Debtor (including, without limitation, any proceeds from the Scott Lawsuit) and accrue interest at an appropriate rate.

5.     Liquidating Plan; Liquidating Trust.  The Debtor shall promptly file a Chapter 11 plan of liquidation (the "*Liquidating Plan*") and accompanying disclosure statement, and shall undertake its best efforts to obtain Bankruptcy Court confirmation of the Liquidating Plan on an expedited basis.  The Liquidating Plan shall:

(a)     provide for the transfer to Grant Glattly of the Debtor's, Salem Partners', Salem Securities', and Salem Services': (1) trade names and marks, (2) furniture and computer equipment (copies of all hard-drives to be made and retained by the "Liquidating Trustee", as defined below), and (3) the San Mateo lease financing contract in consideration for the waiver of Grant Glattly's pre-petition and post-petition claims against the Debtor (except for such claims as expressly preserved herein).  The Debtor shall represent and warrant that the lease financing contract referenced in Section 5.(a)(1) hereof is, in the Debtor's view, of no value to the Debtor's estate;

(b)     establish a liquidating trust (the "*Liquidating Trust*") for the benefit of the Debtor's creditors.  The Debtor shall irrevocably transfer and assign all of its tangible and intangible assets to the Liquidating Trust (including, without limitation, all rights, claims, and causes of action against third parties arising under non-bankruptcy law and Chapter 5 of the Bankruptcy Code[2]) (collectively, the "*Liquidating Trust Assets*").  The Debtor's creditors shall be the beneficiaries of the Liquidating Trust;

(c)     appoint a liquidating trustee (the "*Liquidating Trustee*") reasonably acceptable to the Bell Trust and the Debtor.  The Liquidating Trustee shall, *inter alia*, administer the Liquidating Trust, and reduce the Liquidating Trust Assets to cash;

(d)     Bell Trust shall agree to advance funds on a senior secured, administrative priority basis to the Liquidating Trust in an amount to be determined (collectively with the DIP Loan, the "*Bell Trust Post-Petition Secured Claim*"), which advances shall be used to fund the administration of the Liquidating Trust and the prosecution and collection of the Debtor's rights, claims, and causes of action against third parties.  The advances shall be made pursuant to a credit agreement and budget, each in a form and substance acceptable to the Bell Trust in its sole discretion.  The advances shall be secured by all of the assets of the Liquidating Trust and accrue interest at an appropriate rate;

---

[2]     The "*Bankruptcy Code*" is set forth in Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532.

(e)     in consideration of the waiver, release and discharge of the Debtor's claims and causes of action against Salem Partners, Salem Securities and Salem Services, except as set forth in <u>Section</u> 5.(a) hereof: (i) Salem Partners shall irrevocably transfer and assign all of its assets to the Liquidating Trust, including, without limitation, Salem Partners' interests in the Arden Lane and IPS ventures (the "*SP Assets*"), (ii) Salem Securities shall irrevocably transfer and assign all of its assets to the Liquidating Trust (the "*Salem Securities Assets*"), and (iii) Salem Services shall irrevocably transfer and assign to the Liquidating Trust all of its causes of action (if any) against third parties; provided however, that Salem Services shall preserve its rights, if any, to (x) the Salem Services Claim, and (y) to maintain claims or defenses that: (1) arise in the ordinary course of Salem services business relating to *bona fide* municipal financing transactions; and (2) are against third parties that are not affiliated with Salem Services, the Debtor or their respective affiliates, officers, agents or insiders, (the "*Salem Services Assets*"). The SP Assets, Salem Securities Assets and Salem Services Assets are collectively referred to herein as the "*SPSS Assets*");

(f)     the cash proceeds of the Liquidating Trust Assets (including the first $5,312,228[3] recovered from the SP Assets, but excluding the proceeds (if any) of the Salem Securities Assets and the Salem Services Assets) shall be subject to the following priority and distribution scheme: (i) first, the payment of the administrative expenses of the Liquidating Trust, (ii) second, the satisfaction of the Bell Trust Post-Petition Secured Claim, (iii) third, upon satisfaction of the Bell Trust Post-Petition Secured Claim, a *pro rata* distribution to creditors holding allowed general unsecured claims against the Debtor (including, without limitation, the Bell Trust Pre-Petition Claim and the Lori Glatly Pre-Petition Claim, but excluding the Glatly Estate Claim), and (iv) fourth, on account of the pre-petition equity interests in the Debtor;

(g)     any cash proceeds of: (1) the SP Assets in excess of the initial $5,312,228, (2) the Salem Securities Assets, and (3) the Salem Services Assets addressed above shall be subject to the following priority and distribution scheme: (i) first, the payment of the administrative expenses of the Liquidating Trust, (ii) second, the satisfaction of the Bell Trust Post-Petition Secured Claim, (iii) third, upon satisfaction of the Bell Trust Post-Petition Secured Claim, a *pro rata* distribution to creditors holding allowed general unsecured claims against the Debtor (including, without limitation, the Bell Trust Pre-Petition Claim, the Lori Glatly Pre-Petition Claim, and the Glatly Estate Claim) and (iv) fourth, on account of the pre-petition equity interests in the Debtor; and

(h)     When apportioning payment of the items as described in paragraphs 5.(f)(i)-(ii), and 5.(g)(i)-(ii), such claims shall first be satisfied out of cash proceeds of the non-SPSS Assets, if any, and thereafter such remaining claims, if any, shall be

---

[3]     This figure, representing the amounts owed to the Debtor by Salem Partners <u>et al.</u>, shall be determined and fixed after an accounting in form and substance acceptable to the parties hereto.

satisfied out of the cash proceeds of the SPSS Assets; provided, however, that (i) if the only cash available to the Liquidating Trust at the time any of the claims described in paragraphs 5.(f)(i)-(ii), and 5.(g)(i)-(ii) are due and owing is the cash proceeds of the SPSS Assets, such cash proceeds shall be used to satisfy those claims notwithstanding the fact that the non-SPSS Assets have not yet been exhausted or liquidated, and (ii) upon the eventual liquidation of the non-SPSS assets, such proceeds shall be treated as proceeds of the SPSS Assets to the extent such expenditures have been made in accordance with Section 5.(h)(i) hereof.

6.     Settlement Between the Bell Trust, Glattlys and Related Parties.

(a)     Lori Glattly and Grant Glattly, as applicable, shall submit verified written disclosures to the Bell Trust setting forth to the best of their knowledge: (1) the substantial assets of Lori Glattly, Grant Glattly and Paige Glattly (including, without limitation, all bank and investment accounts); (2) the assets of Salem Partners, Salem Securities, Salem Services, and the Glattly Family Trust; (3) their holdings (if any) in Arden Lane and IPS; (4) the assets and liabilities of the Glattly Estate; and (5) any transfers Lori Glattly, Grant Glattly and Paige Glattly received directly or indirectly from the Debtor, Salem Partners, Arden Lane or IPS since 2004 (collectively, the "*Disclosures*"). For the purpose of verifying the Disclosures, the Bell Trust shall be entitled to consult with the accountants for the Debtor, Salem Partners, the Glattly Estate, and the Glattly Family Trust, without limitations placed upon the exchange of information related to such Disclosures; provided, however, that applicable attorney-client privilege(s) shall be maintained and are not waived hereunder. The Bell Trust shall, contingent upon the accuracy, completeness and acceptability of the Disclosures to the Bell Trust: (x) fully waive, release and discharge any and all rights, claims and causes of action against (i) Lori Glattly, (ii) Grant Glattly, (iii) Paige Glattly, (iv) Salem Partners, (v) Salem Securities, (vi) Salem Services, (vii) the Glattly Estate, and (viii) the Glattly Family Trust (collectively, the "*Salem / Glattly Released Parties*"); and (y) dismiss any claims they may have asserted in the Glattly Estate probate matter currently pending in Lake County, IL. Subject to the continuing efficacy of the Bell Trust waivers, each of the Debtor and the Salem / Glattly Released Parties shall fully waive, release and discharge any and all rights, claims and causes of action against the Bell Trust.

(b)     To the extent that: (i) Lori Glattly incurs personal expenses (including, without limitation, reasonable attorneys fees) in connection with any prospective claims and causes of action brought by either the Liquidating Trust or the Bell Trust against third party defendants (and such expenses, in the nature of witness and similar fees payable by third parties, are not otherwise payable to her as provided by applicable law), such reasonable expenses shall be added to the Lori Glattly Pre-Petition Claim; and (ii) Grant Glattly incurs personal expenses (including, without limitation, reasonable attorneys fees) in connection with any prospective claims and causes of action brought by either the Liquidating Trust or the Bell Trust against third party defendants (and such expenses, in the nature of witness and similar fees payable by third parties, are not otherwise payable to him as

- 5 -

provided by applicable law), such reasonable expenses shall be allowed as a general unsecured claim against the Debtor and the Liquidating Trust. The Bell Trust shall not object to, or seek subordination of (1) the Lori Glattly Pre-Petition Claim, or (2) the claim of Grant Glattly (if any) pursuant to paragraph 6.(b)(ii), in the bankruptcy case.

(c) To the extent that the Bell Trust incurs post-petition expenses (including, without limitation, reasonable attorneys fees) in connection with any claims and causes of action brought by either the Liquidating Trust or the Bell Trust against third party defendants that are not reimbursed as part of the Bell Trust Post-Petition Secured Claim or otherwise, such reasonable expenses shall be added to the Bell Trust Pre-Petition Claim. Each of the parties hereto shall not object to, or seek subordination of, the Bell Trust Pre-Petition Claim, in the bankruptcy case.

(d) The Bell Trust shall expressly reserve any and all rights, claims, and causes of action it may hold against any third party other than the Salem / Glattly Released Parties.

(e) Prior to entering into any of the definitive agreements contemplated by this Term Sheet, Lori Glattly and Grant Glattly shall provide the Bell Trust with drafts of the Disclosures as set forth above in Section 6.(a); provided however, that upon execution of this termsheet by all of the parties hereto, Bell Trust shall immediately seek to withdraw, without prejudice, its Motion seeking the appointment of a Chapter 11 Trustee (or conversion to a Chapter 7) in the Salem Group bankruptcy case.

(f) For the avoidance of doubt, none of the releases and waivers contemplated herein shall be deemed effective or enforceable until the conditions as set forth in Sections (i) and (ii) of the Preamble to this Term Sheet are satisfied.

- 6 -

01/24/2008 14:37 FAX   847 295 1900        K&S GMAC LF EAST                    @002/002

IN WITNESS WHEREOF, the parties have signed this Term Sheet in counterparts as of January __, 2008.

**The Laurmice K. Bell – 1993 Trust**

By: _____

Name: _____

Its: _____

**Salem Capital Partners, Inc.**

By: _____

Name: _____

Its: _____

**The Craig F. Glattly Family Trust**

By: _Lori L. Glattly_

Name: _Lori L Glattly_

Its: _Trustee_

**Salem Capital Services, Inc.**

By: _____

Name: _____

Its: _____

**Grant Glattly**

_____

**Salem Capital Group, Inc., debtor-in-possession**

By: _____

Name: _____

Its: _____

**The Estate of Craig F. Glattly**

By: _Lori L. Glattly_

Name: _Lori L Glattly_

Its: _Independent Executor_

**Salem Capital Securities, Inc.**

By: _____

Name: _____

Its: _____

**Lori Glattly**

_Lori L. Glattly_

**Paige Glattly**

_____

**The Craig F. Glattly Trust**

By: _Lori L. Glattly_

Name: _Lori L Glattly_

Its: _Trustee_

-7-

IN WITNESS WHEREOF, the parties have signed this Term Sheet in counterparts as of January __,2008.

**The Lauralee K. Bell - 1993 Trust**

By:

Name:

Its:

**Salem Capital Partners, Inc.**

By:

Name: _____

Its:

**The Craig F. Glattly Family Trust**

By:

Name:

Its:

**Salem Capital Services, Inc.**

By:

Name: _____

Its:

**Grant Glattly**

**Salem Capital Group, Inc., debtor-in-possession**

By:

Name: _____

Its:

**The Estate of Craig F. Glattly**

By:

Name:

Its:

**Salem Capital Securities, Inc.**

By:

Name:

Its:

**Lori Glattly**

**Paige Glattly**

*Paige Glattly*

**The Craig F. Glattly Trust**

By:__

Name:

Its:

- 7 -

IN WITNESS WHEREOF, the parties have signed this Term Sheet in counterparts as of January __, 2008.

**The Laurukee K. Bell – 1993 Trust**

By: _____

Name: _____

Its: _____

**Salem Capital Partners, Inc.**

By: _____ *Ms. Lori Glattly* _____

Name: Ms. Lori Glattly

Its:     Not individually, but solely in her capacity as:
(i) Trustee for the Craig F. Glattly Trust and the Craig F.
Glattly Family Trust, and (ii) Independent Executor for
the Estate of Craig F. Glattly.

**The Craig F. Glattly Family Trust**

By: _____

Name: _____

Its: _____

**Salem Capital Services, Inc.**

By: _____ *Ms. Lori Glattly* _____

Name: Ms. Lori Glattly

Its:     Not individually, but solely in her capacity as:
(i) Trustee for the Craig F. Glattly Trust and the Craig F.
Glattly Family Trust and (ii) Independent Executor for
the Estate of Craig F. Glattly.

**Grant Glattly**

_____

**Salem Capital Group, Inc., debtor-in-possession**

By: _____

Name: _____

Its: _____

**The Estate of Craig F. Glattly**

By: _____

Name: _____

Its: _____

**Salem Capital Securities, Inc.**

By: _____ *Ms. Lori Glattly* _____

Name: Ms. Lori Glattly

Its:     Not individually, but solely in her capacity as:
(i) Trustee for the Craig F. Glattly Trust and the Craig F.
Glattly Family Trust and (ii) Independent Executor for
the Estate of Craig F. Glattly.

**Lori Glattly**

_____

**Paige Glattly**

_____

**The Craig F. Glattly Trust**

By: _____

Name: _____

Its: _____

- 7 -

IN WITNESS WHEREOF, the parties have signed this Term Sheet in counterparts as of January __, 2008.

**The Lauralee K. Bell ~ 1993 Trust**

By: _____

Name: _____

Its: _____

**Salem Capital Partners, Inc.**

By: _____

Name: _____

Its: _____

**The Craig F. Glattly Family Trust**

By: _____

Name: _____

Its: _____

**Salem Capital Services, Inc.**

By: _____

Name: _____

Its: _____

**Grant Glattly**

**Salem Capital Group, Inc., debtor-in-possession**

By: _____

Name: GRANT W. GLATTLY

Its: PRESIDENT

**The Estate of Craig F. Glattly**

By: _____

Name: _____

Its: _____

**Salem Capital Securities, Inc.**

By: _____

Name: _____

Its: _____

**Lori Glattly**

_____

**Paige Glattly**

_____

**The Craig F. Glattly Trust**

By: _____

Name: _____

Its: _____

**SCHEDULE 2**
**BUDGET**

CHI99 4929325-8.080397.0011



**Operating Budget**

|  | March | April | May |
|---|---|---|---|
| Earthlink | $ 28.90 | $ 28.90 | $ 28.90 |
| Vonage | $ 30.00 | $ 30.00 | $ 30.00 |
| Postage / shipping | $ 20.00 | $ 20.00 | $ 20.00 |
| Office Supplies | $ 20.00 | $ 20.00 | $ 20.00 |
| Equipment Rental | 0.00 | $ 44.50 | 0.00 |
| Computer Maintnance | $ 1,400.00 | 0.00 | 0.00 |
| Legal | $ 25,000.00 | 0.00 | $ 50,000.00 |
| Accounting services | $ 500.00 | $ 500.00 | $ 500.00 |
| UST Fees | 0.00 | $ 975.00 | $ 625.00 |
| Total | $ 26,998.90 | $ 1,618.40 | $ 51,223.90 |